1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                  EASTERN DISTRICT OF CALIFORNIA

11                         ----oo0oo----

BAYKEEPER and its Deltakeeper
12  Chapter, and NATURAL RESOURCES
   DEFENSE COUNCIL,
13                                    NO. CIV. S-06-1908 FCD/GGH

14           Plaintiffs,

        v.                           MEMORANDUM AND ORDER
15
   U.S. ARMY CORPS OF ENGINEERS,
16  et al.,

17           Defendants.

18                         ----oo0oo----

19       This matter is before the court on plaintiffs Baykeeper and

20  its Deltakeeper Chapter and National Resources Defense Council's

21  ("plaintiffs") motion for a preliminary injunction to enjoin

22  dredging adjacent to the Port of Stockton's West Complex Docks 14

23  and 15 (the "Dredging Activities") by defendants Port of Stockton

24  and Stockton Port District (collectively, the "Port"), and to

25  stay the effectiveness of Permit No. 200300038 (the "Permit")

26  issued by defendants U.S. Army Corps of Engineers and its

27  officials (collectively, the "Corps"), authorizing said dredging.

28

                                  1

1    By this action, plaintiffs challenge the decision of the
2 Corps to issue the dredge and fill Permit under Section 404 of
3 the Clean Water Act ("CWA") and Section 10 of the Rivers and
4 Harbors Act without first considering the harmful environmental
5 impacts of the action in an Environmental Impact Statement
6 ("EIS") pursuant to the National Environmental Policy Act of 1969
7 ("NEPA"), 42 U.S.C. § 4321 *et seq.* Specifically, plaintiffs
8 contend the following: (1) that the subject Dredging Activities
9 are an essential component of, and prerequisite for, the Port's
10 West Complex Development Plan Project (the "Project"); (2) that
11 assuming, arguendo, that the Dredging Activities could be
12 separated from the larger Project under NEPA, the Port's EIR
13 demonstrates that the cumulative impacts of the Dredging
14 Activities and the Project cause significant environmental
15 effects; and (3) that an EIS is independently compelled by the
16 National Marine Fisheries Service's ("NMFS") determination that
17 the Project will have a "substantial adverse effect" on federal
18 endangered Chinook salmon and by the ongoing uncertainty
19 regarding the Port's mitigation for dissolved oxygen impacts.

20    The court heard oral argument on plaintiffs' motion on
21 September 15, 2006.  Previously, on August 25, 2006, due to the
22 undersigned's unavailability, United States District Court Judge
23 Morrison England heard plaintiffs' underlying motion for a
24 temporary restraining order ("TRO") seeking the same relief.
25 Finding plaintiffs' showing of irreparable harm insufficient,
26 Judge England denied plaintiffs' motion for a TRO but set the
27 matter on an expedited briefing and hearing schedule before the
28 undersigned on plaintiffs' motion for a preliminary injunction.

2

At the conclusion of the September 15, 2006 hearing, the court announced its intention to issue a stand-still order pending the court's written decision on the motion to be filed on Tuesday, September 19, 2006.  The court asked defendants whether they would have any objection to postponement of the Dredging Activities until that time; defendants stated that they had no objection[1] but asked whether the court would like to visit the site prior to entry of its stand-still order.  The court agreed to visit the site, and indicated that a stand-still order would be in effect upon the conclusion of that visitation, which occurred on September 18, 2006.[2]  The court stated that it would provide a written order on the motion no later than Wednesday, September 20, 2006.

By the instant order, the court now renders its decision on plaintiffs' motion.  Finding plaintiffs have demonstrated a strong likelihood of success on the merits of their NEPA claim and the possibility of irreparable harm, the court GRANTS plaintiffs a preliminary injunction enjoining the Dredging Activities pending final resolution of the case on the merits.

---

[1]    Defendant did note for the record that a two-day postponement of the dredging would cost the Port $18,000.00.

[2]    During the site inspection, the Port represented that the dredging of Dock 15 was nearly complete and would be completed by the end of the day.  As such, the court modified its order to permit the continued dredging of Dock 15 on September 18.  (Minute Order, filed Sept. 18, 2006.)  The court's stand-still order was to go in to effect upon the earlier of the completion of the Dock 15 dredging or Tuesday, September 19, 2006.

3

**BACKGROUND**

**I.    <u>Project Setting</u>**

        The Project is located on the 1,459-acre Rough and Ready
Island ("Island"), which abuts the San Joaquin River's Deep Water
Ship Channel ("DWSC") on the western edge of Stockton,
California. (Ex. 1 to Perlmutter TRO Decl., filed Aug. 24,
2006;[3] Ex. 4 at 1.) The Island is located upstream on the DWSC
from the Port's "East Complex," which has housed the Port's
operations for the last 70 years. (<u>See</u> <u>id.</u>) Shipping access to
both the Island and the East Complex is wholly dependent on the
Corps' ongoing dredging to maintain the DWSC at the 35-foot depth
necessary for most modern commercial ships. (Ex. 17 at 3.)

        In July 2000, the U.S. Navy began transferring the Island to
the Port. (Ex. 24 at 1.) Prior to 2001, no large-scale shipping
had occurred on the Island since at least 1965, when the Navy
discontinued its use as a military supply depot. (Ex. 32.)
During the Navy's ownership, the river bottom adjacent to the
Island's seven docks (Docks 14-20) accumulated extensive, and
heavily contaminated, debris and sediment. (Ex. 11 at 3.) This
sediment makes it impossible to use the Island for large-scale
shipping without extensive additional dredging.

>         Currently, the shallow draft of approximately 20 feet
>         at Docks 14 through 18 and approximately 30 feet at
>         Docks 19 and 20 is not adequate to meet the needs of
>         most modern ships. The Port must establish a draft of
>         35 feet, to remain viable and competitive in the
>         marketplace . . . .

(Exs. 17-20 at 1.)

---

        [3]   Unless otherwise stated all further references to an
"Exhibit" are to the Perlmutter TRO Declaration.

1    While the Port thus has a clear economic incentive to
2    complete the Dredging Activities, counter-balancing that interest
3    is the fact that the Project lies within the San Francisco
4    Bay-Delta Watershed which provides critical habitat for five
5    federally listed endangered or threatened species, including the
6    Sacramento River winter-run Chinook salmon, the delta smelt, the
7    green sturgeon, the Central Valley steelhead trout, and the
8    Central Valley spring-run Chinook salmon.  (Ex. 7 at 10.)

9    **II.**  **Application for a Section 404 Permit for the Project**

10   In August 2003, the Port submitted an application to the
11   Corps for a CWA, Section 404 permit for the larger Project--to
12   dredge all Docks 14 to 20.  Thereafter on September 26, 2003, the
13   Corps issued its Public Notice ("PN") seeking public comment on
14   the Port's proposed dredging activities, explaining that the
15   "applicant's stated purpose is to provide economic development at
16   Port of Stockton's West Complex by dredging the area for
17   commercial shipping use."  (Ex. 5 at 1.)  The referenced
18   "economic development" is the Project, approved by the Port in
19   June 2004, after preparation of a lengthy Environmental Impact
20   Report ("EIR") pursuant to state law.  The Project would
21   construct and operate extensive marine terminal, commercial, and
22   industrial park facilities throughout the Island, effectively
23   tripling the Port's current size and doubling the current level
24   of ship traffic in the DWSC.  (Ex. 7 at 5-7.)  Its main
25   components include a 531-acre marine terminal with seven
26   redeveloped wharves; a 436-acre commercial and industrial park;
27   an additional 409 acres of diversified maritime, commercial, and
28   industrial land use; and an intermodal railyard.  (Ex. 26 at 2-4,

12.)  The Port estimates that the Project will create 150 annual vessel calls to the Port; increase traffic by 51,319 vehicles each day; and substantially increase train trips and the use of polluting yard equipment and diesel tugboats.  (Id. at 6-9.)

For nearly three years after the Corps issued its PN in September 2003, the Corps and other federal and state agencies, including the Port, consistently treated the dredging of Docks 14-20 as an essential component of, and prerequisite for, the Project.  Indeed, even before issuing the PN, the Corps had requested that NMFS initiate consultation under section 7 of the Endangered Species Act ("ESA"), because the Corps "ha[d] determined that the [dredging activities] may adversely affect" several federally listed threatened and endangered species. (Exs. 13-14.)  Under the ESA, such consultation must be completed before the Corps can issue a Section 404 Permit.  (See id.)  On October 10, 2003, NMFS responded that it could not commence the consultation process until the Corps provided "a thorough analysis of the interrelated and interdependent actions that would occur as a result of the dredging activities, particularly the redevelopment of the former Rough and Ready Island naval base (West Complex) and the anticipated increase in Port activities." (Ex. 7 at 1.)  The Corps and the Port agreed "to provide the requested information," and "[o]n November 6, 2003, staff from NMFS, the Corps and Jones and Stokes [consultants to the Port] met [and] agreed to consider the multiple West Complex activities as one project."  (Id.) (Emphasis added.)  Throughout the lengthy ESA consultation process, which culminated in NMFS' July 7, 2006 issuance of the required Biological Opinion ("BO"), the Corps,

6

NMFS, and the Port continued to treat the dredging of Docks 14-20 as an integral, if not critical aspect, of the Project.  (Id. at 2 [explaining the substantial delay in consultation while NFMS waited for the Port to provide the requested information about the larger Project]; id. at 2, 5-7 [BO's description of these "Interrelated and Interdependent Activities"]; see also Ex. 15 at 2-3 ¶¶ 5-6, 8, 10-11 [requesting more information about interdependent shipping activities, dock construction, and stormwater run-off from upland Island activities].) Significantly, the NMFS' cover letter to the BO expressly states that its conclusions apply to the "Port's West Complex Dredging project and *associated and interrelated impacts* of the West Complex Redevelopment project."  (Ex. 6 at 2) (Emphasis added.)

Likewise, in its comment on the PN, the United States Environmental Protection Agency ("EPA") explained that "all aspects of the overall [DWSC] deepening/port development proposal should be evaluated together comprehensively as *one project, and not broken up into separate permit actions*."  (Ex. 31 at 2) (Emphasis added.)  The EPA also noted that the failure of the Corps' PN to fully disclose the U.S. Navy's leasing and transfer of the Island to the Port made it difficult, if not impossible, to discern how the proposed dredging "will enable other secondary (cumulative or growth-inducing) impacts in and around the area to be redeveloped."  (Id.)

Finally, even the Port itself, during this three year period when the Corps was evaluating the permit application, implied that the dredging activities were essential to the viability of the Project.  In permit applications to the California Regional

Water Quality Control Board ("RWQCB") in December 2005 and January, March and May 2006, the Port repeatedly stated that "the shallow draft of approximately 20 feet at Docks 14 through 18 and approximately 30 feet at Docks 19 and 20 is not adequate to meet the needs of most modern ships. The Port must establish a draft of 35 feet, to remain viable and competitive in the marketplace . . . ." (Exs. 17-20 at 1.)

## III. __The Revised Application for a Section 404 Permit for the Dredging Activities at only Docks 14 and 15__

Despite this longstanding treatment of the dredging activities at all docks as an integral part of the Project, on July 27, 2006, just three weeks after the NMFS' issuance of the BO on the Project, the Port submitted a revised Section 404 permit application for dredging only of Docks 14 and 15 (the aforementioned, "Dredging Activities"), asserting, for the first time, that the dredging of those docks was completely independent of the Project (the "Revised Application"). (Ex. 10.)  With its application, the Port submitted a draft "Decision Document," prepared by its consultants, which provided a basis for the Corps' Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the Dredging Activities. (Ex. 9.)

The Corps did not provide any public notice of, or opportunity for public comment on, the Revised Application. Indeed, prior to the Corps' issuance of the Permit three weeks later, these documents apparently were not made available for review by NMFS, the EPA, or even the Corps' own attorney.  As the Corps' Assistant District Counsel, Lisa Clay (who had previously

been involved in the review process), explained in an email sent to plaintiffs' counsel at 4:31 pm on August 16, 2006, "I expect that the EA/FONSI/Decision Document and permit document would be provided to me for review prior to final signature.  As of this writing, I have not been provided any of those documents for review."  (Ex. 21.)  In fact, both the Permit and the EA/FONSI had been issued, and the Port had already commenced dredging pursuant to the Permit, apparently without Ms. Clay's knowledge. (Ex. 4; Perlmutter Decl., filed Aug. 24, 2006, ¶ 8.)

**IV.   <u>The Dredging Activities Authorized by the Permit</u>**

The Corps issued an EA and FONSI and Section 404 Permit for the Dredging Activities on August 16, 2006, finding that the Dredging Activities are an environmentally benign "demonstration project"[4] that is wholly independent of the Project, and thus not subject to NEPA's requirement of a detailed EIS.  (Ex. 4 at 2.) The EA found:

> The project, as currently proposed, neither requires nor relies on any work at Docks 16-20.  Accordingly, the Corps has determined that the proposed project has separate and independent utility from the proposal described in the original permit application [for Docks 14-20] and the 2004 EIR.  Dredging Docks 14 and 15 will allow an adequate number of vessel calls to occur in a manner that is economically viable and will enhance terminal efficiency, regardless of whether Docks 16-20 are ever dredged.  Moreover, unlike the original proposal, the proposed project serves as a demonstration project, which will include monitoring sediment and water quality following dredging operations.  Should a permit be issued for the proposed project, the Corps is not in any way committed to approve work at Docks 16-20.  The Port will

---

[4]     The EA stated: "The proposed project is a minimization of the project noticed by the [Corps] on September 26, 2003 . . . .  The location and extent of the project have been minimized to encompass a smaller dredging area and to conduct a water quality demonstration project at the West Complex Docks 14 and 15."  (Ex. 4 at 1.)

need to submit a separate permit application to the
Corps and other agencies specifically for Docks 16-20.

(Ex. 4 at 2.)   These findings were primarily predicated on the
Corps' determination that the 150 vessels ultimately projected to
visit the Island at full Project build-out "could be accommodated
at Docks 19 and 20 if no additional dredging were performed at
the West Complex." (Ex. 4 at 4.)

The Permit authorized the Port to dredge approximately
130,000 cubic yards ("cy") of contaminated sediment, deepening to
35 feet the river bottom between the edge of Docks 14 and 15 and
the southern margin of the DWSC. (Ex. 4 at 1.)   This authorized
amount is over one-third of the 326,000 cy proposed for dredging
in the Port's original Permit for the entire Project.   (See Ex.
5.)   The dredging commenced on August 16, 2006, the same day as
the issuance of the Permit.[5]

Plaintiffs received the EA and FONSI from the Corps on
August 18, 2006 and moved for a TRO in this court on August 24,
2006, after defendants refused to agree to an expedited schedule
for hearing of a preliminary injunction motion.

### STANDARD

The court may grant a preliminary injunction if plaintiffs
"demonstrat[e] *either* a combination of probable success on the
merits and the possibility of irreparable harm *or* that serious
questions are raised and the balance of hardships tips sharply in

---

[5]     At the time of the hearing, the dredging was
approximately 50% complete.   During the court's site inspection
on September 18, 2006, the Port represented that the dredging of
Dock 15 would be completed that day.   A Port representative
pointed out that modifications had been made to the marine
terminal adjacent to Dock 15, and that no such modifications had
been made to the terminal at Dock 14, which had not been dredged.

[their] favor."  Earth Island Institute v. United States Forest Service, 442 F.3d 1147, 1158 (9th Cir. 2006) (emphasis in original) (internal quotations omitted).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005) (internal quotations omitted).

In Earth Island, the Ninth Circuit emphasized that with respect to the requisite showing of irreparable harm, where probable success on the merits has been demonstrated, a plaintiff need not show "actual harm," the "concrete probability of irreparable harm," or the "significant threat of irreparable injury," as such requirements impose too high a burden on the plaintiff.  442 F.3d at 1158-59.  Rather, a plaintiff must demonstrate only the "*mere possibility* of irreparable injury" in cases where *probable* likelihood of success on the merits exists. Id. at 1159 (emphasis added).

**ANALYSIS**

**I.   Likelihood of Success on the Merits**

**     A.   Scope of Review**

      An agency's decision not to prepare an EIS under NEPA is reviewed under the "arbitrary and capricious" standard of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A), which requires the court to determine "whether the agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."  Nat'l Parks and

11

Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001) (internal quotations and citation omitted).

NEPA, specifically, establishes important "action-forcing" procedures to ensure that the "broad national commitment to protecting and promoting environmental quality" is "infused into" the actions of the federal government.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989).  Perhaps most importantly, by focusing an agency's attention on the environmental consequences of a proposed project, the "action-forcing" nature of NEPA ensures that important effects will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Id. at 349.  For this important reason, adequate environmental evaluation must occur sufficiently early in the planning process to be meaningful.  40 C.F.R. § 1501.2.  NEPA does not, however, mandate particular results but "simply prescribes the necessary procedures;" ultimately, the statute prohibits *uninformed, rather than unwise, agency action*.  Robertson, 490 U.S. at 350-51 (emphasis added).

## B.  Deference Owed to the Corps

The unusual facts in this case warrant a few preliminary observations regarding the Corps' conduct.  While under NEPA the court owes deference to *agency* determinations, it certainly does not owe deference to a permit *applicant*.  Here, it appears the Corps gave unquestioning deference to the permit applicant and now asks this court to do the same.  Indeed, despite its centrality in this action, the Corps' briefing on the motion was, frankly, perfunctory, offering no analysis supported by its own

12

expertise.  At the hearing, the Corps stated it "read and assessed" the Port's application, although it became apparent that the Corps did not conduct an independent and searching analysis of the application prior to issuing the EA.  There were numerous examples of this.  The Corps conceded it primarily relied on the representations of the applicant because the applicant was "honorable" (presumably because the applicant was a public agency), as opposed to a "private landowner."  ([Non-docketed] R.T. on PI, September 15, 2006, at 18, 19-20.)  The Corps also admitted it failed to consult experts in the relevant fields of inquiry.  (R.T. on PI at 18, 25-28.)  Throughout the hearing the Corps readily deferred to the Port's counsel for any detailed explanation of the EA.  (Id. at 11-12, 15-16.)  Indeed, the Corps provided the court little evidentiary basis whatsoever for the findings in the EA.  (Id. at 6, 16-18, 26.)

Clearly, NEPA requires more.  It requires "independent evaluation by the agency based on record evidence."  Florida Wildlife Federation v. U.S. Army Corps of Engineers, 401 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) (finding EA's conclusion of "independent utility" arbitrary and capricious where it was based on "[r]epresentations by the applicant alone, who clearly has an interest in obtaining the permit").

Ultimately, a judicial review of the Corps' EA/FONSI and Section 404 Permit must begin and end with the *Corps*.  Thus, any fault found by the court in this NEPA action lies not with the Port's efforts to pursue dredging its West Complex docks, but rather with the Corps' failure to perform its review mandated by Congress.  Understandably the Port seeks to pursue the

13

development and protection of its interests and therefore has a
vital stake in the outcome of this matter.  However, the Corps,
not the Port, must be the principal focus of this NEPA
litigation, which is intended to scrutinize the Corps' decision
not to perform an EIS.  When placed under such scrutiny, the
court finds, for the reasons set forth below, serious
shortcomings in the Corps' discharge of its responsibilities.

### C.  NEPA Requires an EIS Whenever a Project "May" have a Significant Effect on the Environment

Here, there is no dispute that the Corps' issuance of a
Section 404 permit is a "major Federal action" to which NEPA
applies.  42 U.S.C. § 4332(2)© (NEPA requires federal agencies to
prepare an EIS for all "major Federal actions significantly
affecting the quality of the human environment").  Accordingly,
the Corps acknowledges that it was required, as an initial step,
to prepare an EA to determine whether the Dredging Activities may
have any significant environmental effects.  40 C.F.R. § 1501.3,
1501.4(b), 1508.9, 1508.27.  The purpose of an EA is to "briefly
provide sufficient evidence and analysis" to determine whether
the proposed action will have a significant impact.  <u>Id.</u> at §
1508.27.  An agency must consider the direct, indirect, and
cumulative impacts on the environment.  <u>Id.</u> at § 1508.8,
1508.27(b).  If an agency finds no significant impact, then no
further evaluation of the environmental effects is required.  <u>Id.</u>
at § 1508.9, 1508.13.  The FONSI must be accompanied by a
"convincing statement of reasons" explaining why the project's
impacts are insignificant.  <u>Blue Mountain Biodiversity Project v.
Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998).  "The statement

14

1  of reasons is crucial to determining whether the agency took a

2  'hard lock' at the potential environmental impact of a project."

3  Id.

4      If, on the other hand, "substantial questions" are raised as

5  to whether the project "*may* have a significant effect upon the

6  human environment" then the agency must prepare an EIS to detail

7  the environmental consequences of the proposed action.  Found.

8  for N. Am. Wild Sheep v. USDA, 681 F.2d 1172, 1178 (9th Cir.

9  1982).  Thus, to prevail on its claim that an agency should have

10 prepared an EIS, a "plaintiff need not show that significant

11 effects *will in fact* occur."  Blue Mountain, 161 F.3d at 1212.

12      Here, plaintiffs argue the Corps should have considered the

13 entire West Complex Project as part of its EA and should have

14 prepared an EIS because the Port's own EIR concluded that the

15 Project will have numerous significant environmental impacts.

16 Defendants respond that the EA properly found that the Dredging

17 Activities are *wholly independent* of the Project, and that

18 standing *alone* the Dredging Activities do not have any

19 significant environmental effects.

20      The court must therefore begin its analysis with the

21 procedural issues ordained by the Corps' regulations and NEPA.

22              **1.**   **The Corps' regulations**

23      Agencies may not improperly "segment" projects in order to

24 avoid preparing an EIS; instead, they must consider related

25 actions in a single EIS.  Thomas v. Peterson, 753 F.2d 754, 758

26 (9th Cir. 1985).  "Not to require this would permit dividing a

27 project into multiple 'actions,' each of which individually has

28 an insignificant environmental impact, but which collectively

have a substantial impact." Id.   Moreover, the NEPA process must

be integrated with agency planning "at the earliest

possible time."   40 C.F.R. § 1501.2.   Thus, the Corps cannot

satisfy its obligation under NEPA by preparing an EIS for later

phases of the Project after issuance of this 404 Permit.   Thomas,

753 F.2d at 760.

Specifically, the Corps' regulations require it to consider

the impacts of an entire project.   When an applicant seeks a

permit for an activity which is a component of a larger project,

the Corps' regulations require it to assess "the impacts of the

specific activity requiring a [Corps'] permit and those portions

of the entire project over which the district engineer has

sufficient control and responsibility to warrant Federal review."

33 C.F.R. § 325 (App. B, § 7(b)(1)); Sylvester v. Army

Corps of Engineers, 884 F.2d 394, 398 (9th Cir. 1989).   Thus,

"while it is the development's impact on jurisdictional waters

that determines the scope of the Corps' permitting authority, it

is the impact of the permit on the environment at large that

determines the Corps' NEPA responsibility."   Sonoran, 408

F.3d at 1122.   The Corps has control of and responsibility for

portions of a project beyond Corps jurisdiction "where the

Federal involvement is sufficient to turn an essentially private

action into a Federal action.   These are cases where the

environmental consequences of the larger project are

essentially products of the Corps' permit action."   33 C.F.R. §

325 (App. B, § 7(b)(2)).

Significantly, the Corps' regulations identify dredging

permits for "shipping terminals" as an activity for which the

16

Corps should expand the scope of its NEPA review to include the impacts of a larger upland project:

> [A] shipping terminal normally requires dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function. Permits for such activities are normally considered sufficient Federal control and responsibility to warrant extending the scope of analysis to include the upland portions of the facility.

33 C.F.R. § 325 (App. B, § 7(b)(3)). Courts have construed this example as requiring the Corps to consider the impacts of development on an island in granting a permit for modifications to a bridge that made access to the island possible. Arkansas Nature Alliance v. Army Corps, 266 F. Supp. 2d 876, 891-92 (E.D. Ark. 2003); see also Friends of the Earth v. Army Corps of Engineers, 109 F. Supp. 2d 30, 40-41 (D.D.C. 2000) (applying shipping terminal example to require Corps to expand scope of review for "floating casinos" to include upland impacts from hotels, parking garages and other related development).

The shipping terminal example appears to directly apply here. Preliminarily, the court notes that concurrently with the Dredging Activities at Dock 15, the Port has made modifications to that Dock's marine terminal. Such development is consistent with, as detailed above, the Corps' and Port's three-year treatment of the dredging activities of all docks, 14-20, as an integral and critical component of the Project. Indeed, the NMFS and EPA insisted that the Corps consider the entire Project in one integrated analysis. (Ex. 7 at 1; Ex. 31 at 2.) In Sonoran, the Ninth Circuit emphasized the significance of such comments from federal agencies--"not the usual suspects in opposing the action of [another] federal agency"--in determining that the

17

Corps improperly narrowed its NEPA analysis to avoid preparing an EIS. 408 F.2d at 1122. Under the facts of this case, the Corps' regulation clearly applied to the Project, which included, among other things, dredging, development of marine terminals with redeveloped wharves, and an upland commercial and industrial park. Inexplicably, neither the Corps nor the Port directly addressed, in their briefs, the regulation's application to the facts here. At oral argument, the Corps conceded the regulation covered the Project (R.T. on PI at 11) but failed to explain why the Corps did not apply it in the EA.[6]

Accordingly, for these reasons, the court finds that plaintiffs have demonstrated a probable likelihood of success in demonstrating that the Corps acted arbitrarily in failing to follow its own regulations. Sierra Club v. Martin, 168 F.3d at 1, 4 (11th Cir. 1999) (the court "must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself").

## 2.   NEPA regulations

Similar to the Corps' regulations, NEPA regulations require agencies to consider "connected," "cumulative," and "similar" actions within a single EA or EIS. 40 C.F.R. § 1508.25. Plaintiffs argue that the Dredging Activities here meet the requirements of each of these types of action. For example, the regulations provide that actions are "connected" if they (1)

---

[6]   At oral argument, the Port summarily dismissed the regulation as irrelevant, arguing that it was inapplicable as the marine terminal areas had already been developed. Not only is the Port's argument factually incorrect, any completion of portions of the development of the West Complex simply does not render the regulation inapplicable.

18

"[a]utomatically trigger" other actions which may require an EIS;
(2) "[c]annot or will not proceed unless other actions are taken
previously or simultaneously"; or (3) are "interdependent parts
of a larger action and depend on the larger action for their
justification."  40 C.F.R. § 1508.25(a)(1).  Where it would be
"irrational, or at least unwise" to undertake one action without
subsequent actions, the actions are connected.  Save the Yaak
Comm. v. Block, 840 F.2d 714, 720 (9th Cir. 1988) (road
construction and timber sales had "clear nexus" and were thus
"connected actions" requiring expanded scope of review); Thomas,
753 F.2d at 759 (road and timber sales were "inextricably
intertwined").  "Connected actions" need not be federal actions.
See Morgan v. Wolter, 728 F. Supp. 1483, 1493 (D. Id. 1989)
(Corps required to consider impacts of private fish propagation
facility prior to issuing 404 permit for water diversion project
because the projects were "links in the same bit of chain").

        To the contrary, when courts have found the "independent
utility" of the specific permitted activity, they have held that
the Corps did not need to include the larger project in its scope
of review.  The crux of the "independent utility test" is whether
"each of two projects would have taken place with or without the
other . . . .  When one of the projects might reasonably have
been completed without the existence of the other, the two
projects have independent utility and are not connected for NEPA
purposes."  Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969
(9th Cir. 2006).

        In the instant case, the EA finds independent utility on the
grounds that the "[d]redging of Docks 14 and 15 will allow an

19

adequate number of vessel calls to occur in a manner that is economically viable and will enhance terminal efficiency regardless of whether Docks 16-20 are ever dredged" and that without any additional dredging at all, the entire Project could proceed apace because the Port "could accommodate most deeper draft vessel traffic at Docks 19 and 20."  (Ex. 4 at 2, 4.) While these "grounds" may establish limited beneficial consequences of the Dredging Activities, they do not provide a rational basis for the finding of independent utility.  That finding is belied by a confusing and self-contradictory record.

While the EA asserts the Dredging Activities' independence from the Project, it also asserts that the primary purpose of the Dredging Activities is to *enable* the subsequent dredging of the Project's other docks.  Clearly and repeatedly, the EA proclaims the stated purpose of the Dredging Activities is a "demonstration project"[7]--a "minimization of the [P]roject" originally noticed by the Corps in 2003--which is intended "to substantiate the analysis and characterization of water quality and sediment *prior to conducting dredging of more contaminated materials*."  (Ex. 4 at 2, 5) (Emphasis added.)  The EA provides further that:  "The demonstration project [would] . . . provide information to better respond to public comments . . . received by the Corps and the Central Valley Water Board on the *full project*."  (Id.) (emphasis

---

[7]    The Port's counsel admitted at hearing that the Port was responsible for the use of the term "demonstration project." The Port's counsel stated that it was her "fault" if the term, "demonstration project," caused any confusion for the court; she argued that the principal focus of the Dredging Activities was the efficiency and economic viability of Docks 14 and 15 after the dredging.  As set forth below, her position is wholly unsupported by the record and indeed, the EA itself.

added); (see also Ex. 4 at 5 ["the limited pilot project . . .
(would) gather . . . monitoring data *prior to approval of the
full project*"] (emphasis added).)   In sum, the EA found:

> This information *will facilitate* dredging contaminated
> sediment from *other docks* . . . . [T]he information
> collected in the demonstration project will be used
> to develop control strategies and monitoring methodologies
> to safely remove contaminated material in future
> dredging operation at other West Complex docks.

(Ex. 4 at 12.)   Thus, by the EA's express findings the Dredging
Activities do not have independent utility from the Project as a
whole.

The EA offers an alternative ground to find independent
utility based upon a "*water quality*" demonstration component to
the Dredging Activities.   (Ex. 4 at 1 ["The smaller project . . .
entails monitoring to generate additional data characterizing the
chemistry and fate of the dredged sediment and associated
water."])   While the collection and disposal of sediment offers
opportunities to review the chemistry and fate of such materials,
this characterization, under any reasonable interpretation,
cannot transform the dredging of the DWSC into a "water quality"
project.   Clearly, the focus of the permitted activity was
*dredging* to facilitate *further* dredging; any water quality
assessment as a result of the dredging was ancillary.

The Corps offers yet a third and novel justification for the
independent utility of the Dredging Activities--that the dredging
will provide scientific support regarding dissolved oxygen ("DO")
levels to permit further dredging.   (Ex. 4 at 1, 2, 5, 12.)   NEPA
simply prohibits this justification for segmentation.   Thomas,
753 F.2d at 758.   Stated another way, NEPA requires the Corps to

21

discern answers to the environmental questions *before* it decides to issue a Section 404 Permit; NEPA does not allow the Corps to issue a Section 404 Permit in order to gather data in anticipation of *unanswered* environmental questions.  <u>Robertson</u>, 490 U.S. at 351.[8]

Finally, the court is troubled by the obvious haste with which the Corps permitted the Dredging Activities.  Without explanation, the Port, after a lengthy but successful state permitting process advancing the Project through various controversies and legal challenges, abruptly changed course and applied for a Section 404 Permit for the dredging of only Docks and 14 and 15 as a "water quality demonstration project."  This sudden turn of events should have served as a red-flag to the Corps or any federal agency.  Instead, the Corps, according to its counsel "jumped on the application," (R.T. on PI at 8:21), apparently adopting the draft "Decision Document," prepared by the Port's consultants, as the basis for its analysis.

---

[8]     Plaintiffs also point to additional evidence in the record to demonstrate that the Corps' conclusion of independent utility was arbitrary and capricious, including: (1) The Port's repeated insistence that "the shallow draft of approximately . . . 30 feet at Docks 19 and 20 is not adequate to meet the needs of most modern ships.  The Port must establish a draft of 35 feet to remain viable and competitive in the marketplace . . . ."  (Exs. 17-20 at 1); (2) The Corps' own conclusion in the EA that the Port "must expand its operations through deepening Docks 14 and 15 in order to remain competitive enough to stay in business."  (Ex. 4 at 24); (3) The determinations by NMFS and EPA that the Dredging Activities and the Project are interdependent and related activities (Ex. 7 at 1-3, 5-7; Ex. 31); (4) For more than three years the Corps and Port treated the Dredging Activities as part of the entire West Complex Project; and (5) The Port itself concluded in the EIR that this Project would have significant adverse impacts on the environment.  This evidence further supports the court's finding that plaintiffs have demonstrated a probable likelihood of success on the merits of this claim.

Subsequently, without comment or review from the other previously involved federal agencies, the Corps issued the EA/FONSI and Permit within *three* weeks of the application.

In light of the Corps' virtually "automatic" response to the unusual application in this case, the court finds the <u>Florida Wildlife Federation v. U.S. Army Corps of Engineers</u> case instructive.  401 F. Supp. 2d 1298 (S.D. Fla. 2005).  There, the court held that:

> Not unlike the impropriety of segmentation to avoid significance, manipulation of a project design to conform to a concept of independent utility, particularly with the intention that a permit be expedited, undermines the underlying purposes of NEPA.

<u>Id.</u> at 1323.  In <u>Florida Wildlife</u>, Palm Beach County, Florida entered into plans with the Scripps Research Institute to build a large Biotechnology Research Park on an 1,919-acre undeveloped parcel.  The project plans called for a Scripps research facility as the core tenant, with additional facilities to be offered to other biotech-related businesses.  The subject property contained wetlands and thus fill permits were required from the Corps. While the project plans went out for the entire project, the County applied for a Section 404 permit for the Scripps facility portion of the project only.  Ultimately, the Corps issued an EA/FONSI and Section 404 permit for the Scripps facility.  <u>Id.</u> at 1303-07.

Environmental groups sued the Corps for failure to comply with NEPA, arguing that the Corps failed to consider the project as a whole and improperly segmented the Scripps facility project for consideration on its own.  <u>Id.</u> at 1311.  The Florida district court agreed with the plaintiffs.  That court found persuasive to

23

its analysis that the Scripps facility had always been conceptualized as part of the integrated *entire* project.  Id. at 1317.  "The inescapable conclusion from the record is that the . . . [the Scripps facility project] was never intended to stand alone–not, that is, *until time came to apply [to the Corps for a permit]*."  Id. at 1318 (emphasis added).  As such, the court concluded that the "inescapable conclusion from the record is that the 'independent utility' concept [was] developed post-hoc as an avenue to limit and expedite permit review."  Id. at 1321.  Similarly here, the court is persuaded that a very similar confluence of facts and circumstances in this case undermine any notion of "independent utility."

Therefore, for all of the above reasons, the court finds plaintiffs have demonstrated a strong likelihood of success in demonstrating that the EA's conclusion of independent utility for the Dredging Activities was arbitrary and capricious.[9]

### D.   The Corps is Required to Consider the Cumulative Impacts of the Dredging Activities and the Project

An agency's NEPA analysis must consider cumulative impacts even if two projects are not considered cumulative actions.  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 895-96 n.2 (9th Cir. 2002) (agency violated NEPA by failing to analyze cumulative impacts of reasonably foreseeable future actions although those actions were not "cumulative actions"); accord Great Basin, 456 F.3d at 969, 971-73.  A "cumulative impact" is

_____

[9]   Because the court makes this finding it does not consider plaintiffs' alternative arguments that the Corps violated NEPA because the Dredging Activities are "cumulative" or "similar" action to the full Project.

defined as:

> the impact on the environment which results from the
> incremental impact of the action when added to other
> past, present, and reasonably foreseeable future
> actions regardless of what agency (Federal or non-Federal)
> or person undertakes such other actions. Cumulative
> impacts can result from individually minor but
> collectively significant actions taking place over a
> period of time.

40 C.F.R. § 1508.7.  "[P]roper consideration of the cumulative

impacts of a project requires some quantified or detailed

information; . . . [g]eneral statements about possible effects

and some risk do not constitute a hard look absent a

justification regarding why more definitive information could not

be provided."  Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d

989, 993 (9th Cir. 2004) (internal quotations and citations

omitted).  Thus, the Ninth Circuit has held that a reviewing

agency cannot simply offer conclusions.  Rather, it must identify

and discuss the impacts that will be caused by each successive

project, including how the combination of those various impacts

is expected to affect the environment, so as to provide a

reasonably thorough assessment of the projects' cumulative

impacts.  Id.  "The analysis must be more than perfunctory," id.

at 994, and "must give a sufficiently detailed catalogue of past,

present, and future projects, and provide adequate analysis about

how these projects, and differences between the projects, are

thought to have impacted the environment."  Lands Council v.

Powell, 395 F.3d 1019, 1028 (9th Cir. 2005).

    Here, the EA contains a conclusory one-paragraph description

of secondary and cumulative effects from the combined impacts of

the Dredging Activities and other activities associated with the

West Complex Project.  (Ex. 4 at 18-19.)  Specifically, the EA
found:

> The project would have secondary and cumulative
> effects primarily on traffic, noise, and air quality.
> These secondary effects would largely result from ship
> and vehicle traffic associated with operations at the
> West Complex.  As described in the resource discussions
> above, the proposed action would not be expected to
> increase effects on these resources when compared to
> the no action alternative.  In the case of traffic,
> noise, and air quality the proposed action would have
> beneficial effects on traffic, air quality, and noise
> by providing more efficient loading and operations
> and eliminating short haul trips associated with
> loading vessels exclusively at Docks 19 and 20 on the
> West Complex.

(Id.)  These bare findings are wholly insufficient under the

standards set forth by Congress and federal case law.  They are

vague and generalized; contain no quantified or detailed

information; and lack any "detailed catalogue of past, present,

or future projects."  Lands Council, 395 F.3d at 1028.  The Ninth

Circuit has routinely invalidated such conclusory, incomplete

cumulative impacts analyses.  See e.g. Klamath-Siskiyou, 387 F.3d

at 994 (rejected 12-page cumulative impacts sections in a series

of EAs as inadequate because the EAs lacked a "quantified

assessment" of the combined environmental impacts of the various

projects, or any data to support its conclusions); Great Basin,

456 F.3d at 973-74 (finding cumulative impacts analyses in two

EISs insufficient because they were conclusory and failed to

provide specific, quantified information).

     Nor can defendants persuasively claim that the West Complex

Project was not "reasonably foreseeable" for the purposes of 40

C.F.R. § 1508.7.  The Port had already approved this entire

Project and purported to review these very impacts, which it

found were "significant," as part of the Port's comprehensive redevelopment plan for the West Complex.  Moreover, the Corps' suggestion that it did not need to examine the Project's cumulative impacts is of particular concern in light of the Corps' *August 17, 2005* correspondence to the Port in which it wrote that "we have determined our scope of analysis for this project is all of the development, . . ., including development of Rough and Ready Island."  (Supp. Perlmutter Decl., filed Sept. 7, 2006, at Ex. 2.)  "In addition," the Corps explained, "we have identified the following potentially significant effects, including cumulative and secondary impacts."  Id. (listing cumulative impacts "from ships, trucks, and associated port facilities").  Instead of actually undertaking the required cumulative impacts analysis, however, the Corps simply asserted that "[t]he project would have secondary and cumulative effects primarily on traffic, noise and air quality," and then summarily concluded that these impacts are not problematic.

This conclusion, however, relies on a flawed environmental baseline analysis.  (Ex. 4 at 18-19.)  In determining whether an action will significantly affect the environment, federal agencies are required to review the proposed action in light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it; and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.  Hanly v. Kleindienst, 471 F.2d 823, 830-31 (2d

Cir. 1972).  Thus, the EA was required to compare the effects of the ultimate 150 additional vessels and associated vehicular and rail traffic that the Dredging Activities and related Project would generate, to the existing baseline without those impacts. The Corps did not undertake this analysis in the EA.

For all of these reasons, the court finds that plaintiffs have alternatively demonstrated a probability of success on the merits in showing that, even if the Dredging Activities were properly segmented from the Project itself, the EA violated NEPA in failing to adequately consider the cumulative *impacts* of the two actions.

> **E.    NMFS' Significance Determination and the Level of Uncertainty about the Effectiveness of the Port's Mitigation Efforts Warrants Preparation of an EIS**

Plaintiffs argue alternatively that an EIS is independently compelled by NMFS' determination that the Project will have a "substantial adverse effect" on federal endangered Chinook Salmon and by the high level of uncertainty regarding the effectiveness of the Port's mitigation for DO impacts.  First, regarding the NMFS' significance determination, as this court explained in Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Service, 373 F. Supp. 2d 1069, 1080-81 (E.D. Cal. 2004):

> [F]or purposes of NEPA, a project need not jeopardize the continued existence of a threatened or endangered species to have a "significant" effect on the environment. Viability is a standard under the ESA, not under NEPA. Instead, NEPA's "significant effect" analysis is guided by regulations which outline relevant factors for determining whether an action will be significant . . . One such factor is "the degree to which the action *may* adversely affect an endangered or threatened species" . . . 40 C.F.R. § 1508.27(a).

In this case, the BO not only found that the Project "may" affect federally listed species, but that the increased shipping enabled by the dredging would cause "a substantial adverse effect" on the endangered Chinook salmon.  (Ex. 7 at 69 ["The projected entrainment values for Chinook salmon on the San Joaquin River due to the increased shipping activity represent a *substantial adverse effect* on this population of fish." (emphasis added)]; see id. at 45 ["The proposed action is *likely to adversely affect* [the five] listed species and habitat . . ."] (emphasis added); id. at 47 [Port's Project "is expected to *adversely affect* listed salmonids during both the construction and port operation phases"] (emphasis added).)  As in Klamath-Siskiyou, "[s]tanding alone, this suggests the need for an EIS." 373 F. Supp. 2d at 1080-81 (finding EA's conclusion that the project "'will affect, is likely to adversely affect' the Northern Spotted Owl" alone an "important factor" supporting the need for an EIS).

Defendants respond, arguing that the EA found that the Dredging Activities will *not* increase shipping to the West Complex.  Their argument, however, is based on a false premise. As set forth above, the Dredging Activities are not properly segmented from the Project, as the dredging of Docks 14 and 15 facilitate and enable the further dredging of the other Project docks, and thereby the Project, itself.  In other words, the instant Dredging Activities are a mere step in furtherance of many other steps in the overall development of the massive West Complex Project.  Accordingly, defendants cannot ignore the BO's significance findings, as the Project, as a whole, is the proper

29

1   reference point under NEPA.

2       Moreover, given the level of uncertainty concerning the

3   Port's mitigation measures, the Corps was obligated to consider

4   the degree to which the Dredging Activities' effects were "highly

5   controversial" or "highly uncertain."  40 C.F.R. § 1508.27(b)(4)-

6   (5).  While the Port asserted that it would adequately mitigate

7   the existing critical DO deficit in the San Joaquin River and

8   DWSC by using jet aeration devices to pump additional oxygen into

9   the water, the NFMS noted in the BO that there was substantial

10  uncertainty regarding the effectiveness of these mitigation

11  measures.  (Ex. 7 at 56.)  Likewise, the RWQCB expressed concerns

12  about the mitigation, noting that if aeration proved inadequate

13  and species are harmed, then further study after the fact will be

14  of no avail. (Supp. Perlmutter Decl., filed Sept. 7, 2006, Ex. 10

15  at 16, 18-20, 40-41, 130-31, 158, 161, 167-68.)  Even the Port's

16  own consultants had acknowledged that despite years of effort,

17  they had not been able to demonstrate the effectiveness of the

18  aeration devices or identify reliable means of improving them.

19  (Exs. 11 and 12.)

20      Despite these concerns, the EA, does not mention any level

21  of uncertainty.  Rather it simply asserts that the Port's

22  aeration would be effective and that "similar devices have proven

23  to adequately disperse oxygenated water nearly completely both

24  horizontally and vertically across the DWSC within 24 hours."

25  (Ex. 4 at 9-10.)  In Klamath-Siskiyou, this court found in very

26  similar circumstances that an EIS was mandated; the court found

27  that the EA's listing of mitigation measures without analytical

28  data to support the conclusion violated NEPA and required an EIS.

30

373 F. Supp. 2d at 1085-86.  Here, there is not only no data to support the EA's conclusion, there is not even a hint of the considerable uncertainty and controversy surrounding the issue, itself.  (Exs. 3, 10, 11.)

Based on such evidence and supporting case law, plaintiffs have clearly demonstrated a likelihood of success in proving these arguments on the merits.

## II.  <u>Irreparable Harm</u>

Plaintiffs have shown a strong likelihood of success on the merits.  Therefore, the required showing of irreparable harm is considerably diminished.  <u>Colorado River Indian Tribes v. Marsh</u>, 605 F. Supp. 1425, 1429 (C.D. Cal. 1985) ("the more possibility of success on the merits that a plaintiff establishes, the less he or she must show in the way of irreparable harm").  As set forth below, plaintiffs have demonstrated the requisite possibility of irreparable harm to species and the environment.

Initially, defendants challenge plaintiffs' showing of irreparable harm, arguing that plaintiffs seek imposition of a *presumption* of irreparable harm based on the claimed environmental injury.  Contrary to defendants' protestations, plaintiffs do not argue that they are entitled to such a presumption; indeed plaintiffs concede that no such presumption exists.  (TRO P&A, filed Aug. 24, 2006, at 21.)  Rather, plaintiffs argue based on several Ninth Circuit cases that the *procedural injury* caused by the Corps' unlawful failure to prepare an EIS constitutes irreparable harm.  (<u>Id.</u> at 21-22.)  For example, in <u>Nat'l Parks</u>, the Ninth Circuit held that "because NEPA can do no more than require the agency to produce and

31

consider a proper EIS, the harm that NEPA intends to prevent is imposed when a decision . . . is made without the informed environmental consideration that NEPA requires."  241 F.3d at 738 n.18; accord, Sonoran, 408 F.3d at 1124 (upholding the district court's grant of a preliminary injunction and rejecting the defendant's argument that plaintiff was relying on a presumption of irreparable harm).

Similar to Sonoran, here, plaintiffs proffer evidence of environmental harm in the form of depleted DO levels from the dredging affecting the endangered and threatened fish species as well as significant adverse affects on those species from increased ship traffic and channel volume due to the development of the West Complex Project.  Here, it is undisputed both that the Project would exacerbate the existing critical DO deficit in the San Joaquin River and DWSC, and that adequate DO is essential to the survival of the five federal listed species in the area. (Schussman Decl., filed Sept. 1, 2006, Ex. A at [Port's EIR disclosing that proposed dredging activities contribute to the cumulative deficit of the DWSC and that the resultant cumulative impacts to DO in the DWSC are potentially significant]; Supp. Perlmutter Decl. at Ex. 1 [Port acknowledging that DO impacts are of "particular concern"]; Ex. 7 at 34, 48-49, 55-56, 61, 83 [BO discussing impacts of low DO].)

Specifically, as set forth above, the NMFS determined in the BO, not only that the Project "may" affect federally listed species, but that the development of the West Complex enabled by the dredging would cause "a substantial adverse effect" on the endangered Chinook salmon.  (Ex. 7 at 45, 47, 69.)  "Standing

alone, this suggests the need for an EIS," and certainly supports
a finding of a *possibility* of irreparable harm.   Klamath-
Siskiyou, 373 F. Supp. 2d at 1080-81.   Defendants' argument,
to the contrary, emphasizing the BO's ultimate "no jeopardy"
finding under the ESA is unavailing.   "[F]or purposes of
NEPA, a project need not jeopardize the continued existence
of a threatened or endangered species to have a
"significant" effect on the environment."   Id.   In this
case, plaintiffs properly rely on the BO's findings to
substantiate their case for irreparable harm to species and
the environment.

     While defendants submit evidence (see Grimes, May and Steed
Decls., filed Sept. 11, 2006), from the mandated RWQCB-monitoring
program of DO levels, showing that the DO levels in the vicinity
of the dredgers have met or exceeded the required standards,
plaintiffs submit contrary evidence through their expert.   Dr.
Diran Tashjian disputes defendants' results based in part on his
own testing performed on September 1, 2006, which found the DO
levels at two locations near the dredging below the requisite 5.2
mg/L and also below the instantaneous acute lower limit of 4.0
mg/L set by the EPA to prevent mortality to salmonids (see
Tashjian Decls., filed Sept. 7 and 11, 2006).   Plaintiffs' expert
concluded that these reduced DO levels are directly and adversely
affecting any green sturgeon or endangered salmon in the
vicinity.   (Tashjian Decl., filed Sept. 7, 2006, ¶ 8.)   At this
juncture in the case and on the limited record before it, the
court cannot resolve the parties' dispute on this issue; however,
considering that plaintiffs' expert's testimony is consistent

with the BO's findings, it is, at a minimum, *some* further

evidence of a *possibility* of irreparable harm.  (Ex. 7 at 34, 55-

56, 90.)

        In sum, in light of the strong showing on the merits of

their NEPA claim, the court finds plaintiffs' evidence[10]

sufficient to demonstrate the possibility of irreparable harm.

**III. <u>Balance of Hardships</u>**

        Where, as here, plaintiffs have shown sufficiently strong

likelihood of success and the possibility of irreparable harm,

preliminary injunctive relief is appropriate regardless of the

balance of hardships.  <u>Earth Island</u>, 442 F.3d at 1158 (describing

elements of the "alternative" test for granting a preliminary

injunction).[11]  Nevertheless, the court notes that in this case,

the balance of interests do not tip in defendants' favor.

Weighing against the possibility of significant environmental

injury here is the Port's claimed economic losses should a

preliminary injunction issue.  Those losses include an

anticipated $423,000.00 in mobilization and demobilization fees

paid to the dredging contractors.  (Kasper Decl., filed Sept. 1,

2006.)  Such financial hardship cannot outweigh potential

irreversible harm to the environment.  <u>See, e.g.</u>, <u>Earth Island</u>,

442 F.3d at 1177 (economic losses suffered as a result of

enjoined timber sales does not outweigh potential irreparable

---

        [10]    Plaintiffs offered a myriad of other bases for the
claimed irreparable injury here; however, because the court finds
plaintiffs' showing sufficient with regard to the DO level issue,
it does not consider their other claims of injury.

        [11]    In <u>Earth Island</u>, the court appears to have applied the
"traditional" test for entry of a preliminary injunction.  <u>Id.</u> at
1158, 1177-78.

environmental harm and the public's interest in preserving the environment); <u>Idaho Sporting Congress Inc. v. Alexander</u>, 222 F.3d 562, 569 (9th Cir. 2000) (injunction proper where environmental harm was sufficiently likely, despite fact that it "could present financial hardship" to government agency); <u>Nat'l Parks</u>, 241 F.3d at 738 ("loss of anticipated revenue . . . does not outweigh the potential irreparable harm to the environment"); <u>Western Radio Servs. Co. v. Espy</u>, 79 F.3d 896, 902-03 (9th Cir. 1996) (finding that "NEPA's purpose is to protect the environment, not the economic interests of those adversely affected by agency decisions") (internal quotations omitted).

Moreover, the court must consider that the Port voluntarily undertook the risk that the dredging would not be commenced or completed this Fall.  Defendants admit the Port "let the dredging contract and . . . publicly set its electric dredge in the water before obtaining its final permit from the Corps."  (Opp'n, filed Sept. 1, 2006, 42:1-3.)  Indeed, at the time the Port entered into the dredging contracts, it had not submitted to the Corps the Revised Application for permission to dredge at Docks 14 & 15.  (Exs. 9-10 [application submitted on July 27, 2006].)  The Port did not secure approval from the Corps to dredge Docks 14 and 15 until August 16, 2006--nearly one month after the Port entered into the dredging contracts.  In short, the Port knowingly accepted the risk that dredging may not even commence in 2006.  Nevertheless, the financial loss that will be incurred as a result of this order is not insubstantial.  However, in all such cases when the court finds the nation's environmental laws have been violated, economic loss (here, in the amount of several

1 hundred thousand dollars) must yield to NEPA.

2 **CONCLUSION**

3     Therefore, for the foregoing reasons, the court GRANTS

4 plaintiffs' motion for a preliminary injunction:

5     IT IS HEREBY ORDERED that the Port, and its respective

6 agents, partners, employees, contractors, assignees, successors,

7 representatives, and all persons acting under authority from, in

8 concert with, or for it in any capacity, are enjoined from

9 further dredging adjacent to Docks 14 and 15 of the West Complex

10 and the Corps' Permit, authorizing said dredging, is stayed,

11 pending final resolution of the case on the merits.

12     In the court's discretion and in light of the nature of the

13 case, the court relieves plaintiffs of the obligation to file a

14 bond.  Fed. R. Civ. P. 65(c); <u>See People ex rel. Van de Kamp v.</u>

15 <u>Tahoe Regional Plan</u>, 766 F.2d 1319 (9th Cir. 1985) (bond not

16 required because of the "chilling effect" on public interest

17 litigants seeking to protect the environment).

18     IT IS SO ORDERED.

19  DATED: September 20, 2006

20

21                     <u>/s/ Frank C. Damrell Jr.   </u>

22                     FRANK C. DAMRELL, Jr.
                    UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28